FILED
United States Court of Appeals
Tenth Circuit

August 26, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JACOB MARK MIERA,

     Defendant-Appellant.

No. 07-4211

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:07-CR-00205-TS)**

Bretta Pirie, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender, with her on the briefs), Office of the Federal Defender, Salt Lake City, Utah, for Defendant-Appellant.

Elizabethanne C. Stevens, Assistant United States Attorney (Brett L. Tolman, United States Attorney, with her on the brief), Office of the United States Attorney, Salt Lake City, Utah, for Plaintiff-Appellee.

Before **KELLY**, **EBEL**, and **O'BRIEN**, Circuit Judges.

**EBEL**, Circuit Judge.

This direct criminal appeal involves a single sentencing issue: whether the district court erred in enhancing Defendant-Appellant Jacob Miera's offense level

for physically restraining persons during a bank robbery. Miera and his brother, Timothy, robbed a bank in West Valley, Utah. During the course of the robbery, Timothy stood in front of the bank's door waving a gun and demanding that the bank's occupants "don't move." The district court determined that under such circumstances U.S.S.G. § 2B3.1(b)(4)(B)[1] applied and therefore increased Miera's offense level by two. Miera appeals, arguing that he should not be subject to the two-level enhancement. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

The facts of this case are not in dispute. On December 7, 2006, Miera and Timothy entered the Chase Bank in West Valley, Utah. According to witnesses, upon entering the bank, the pair instructed everyone inside to "put their hands up" and demanded that the bank's occupants "don't move." Thereafter, Timothy remained near the bank's door and pointed a gun around the room, "telling ... people not to move in a loud, strong voice." While Timothy remained near the bank's door, Miera approached a teller station, keeping one hand under his clothing. This suggested to the teller and other witnesses that he was concealing a weapon.

---

[1] U.S.S.G. § 2B3.1(b)(4)(B) provides that "if any person was physically restrained to facilitate commission of the [bank robbery] or to facilitate escape, increase [the offense level] by 2 levels."

When Miera reached the teller station, he demanded money in large denominations. The teller complied, providing Miera with $6,745. Thereafter, both men exited the bank and were driven away by Miera's girlfriend. Upon identifying Miera and Timothy as the perpetrators of the robbery, investigators captured the pair and ultimately seized two "air-powered pellet pistols," which were identified as the weapons that were involved in the incident.[2]

As a result of his conduct, Miera was indicted for committing one count of armed bank robbery in violation of 18 U.S.C. § 2113(a) & (d). Miera pled guilty to the charge. Pursuant to U.S.S.G. § 2B3.1, Miera's base offense level was 20. The presentence report ("PSR"), however, recommended that Miera's offense level be increased by a total of seven levels: two levels pursuant to U.S.S.G. § 2B3.1(b)(1) because Miera robbed a financial institution, three levels pursuant to U.S.S.G. § 2B3.1(b)(2)(E) because Timothy brandished a dangerous weapon during the offense, and two levels pursuant to U.S.S.G. § 2B3.1(b)(4)(B) because persons were "physically restrained" to facilitate the offense. Based on these adjustments, as well as a three-level reduction for acceptance of responsibility, the PSR determined that Miera's total offense level was 24. When coupled with a criminal history category of I, Miera's resulting guideline sentence range was 51-63 months' imprisonment.

---

[2] According to Miera, only one of the weapons was used during the robbery, as he maintains that he did not conceal a weapon underneath his shirt.

Miera objected to the PSR's conclusion that his offense level should be increased by two levels pursuant to § 2B3.1(b)(4)(B) for physically restraining persons during the course of the robbery. After considering the matter at Miera's sentencing hearing, the district court ultimately found the enhancement to apply. Thereafter, the court sentenced Miera to forty-six months' imprisonment and thirty-six months of supervised release, a sentence below his guideline range. Miera now appeals, the lone issue being whether the district court erred in finding § 2B3.1(b)(4)(B) applicable.

## II. DISCUSSION

### A. Standard of Review

"When evaluating sentence enhancements under the Sentencing Guidelines, we review the district court's factual findings for clear error and questions of law *de novo*." United States v. Mozee, 405 F.3d 1082, 1088 (10th Cir. 2005).

### B. U.S.S.G. § 2B3.1(b)(4)(B)

U.S.S.G. § 2B3.1(b)(4)(B) provides that "if any person was physically restrained to facilitate commission of [a bank robbery] or to facilitate escape, increase [the offense level] by 2" levels. This court has previously concluded that "[t]he enhancement for physical restraint is applicable when the defendant uses force to impede others from interfering with commission of the offense." United States v. Fisher, 132 F.3d 1327, 1329 (10th Cir. 1997). For purposes of this enhancement, "[p]hysical restraint is not limited to physical touching of the

victim.  Rather, physical restraint occurs whenever a victim is specifically prevented at gunpoint from moving, thereby facilitating the crime.  *Keeping someone from doing something* is inherent within the concept of restraint...." Id. at 1329-30 (citations omitted).  Thus, "we have determined an enhancement for physical restraint is applicable when the defendant uses force, including force by gun point, to impede others from interfering with commission of the offense." United States v. Pearson, 211 F.3d 524, 525-26 (10th Cir. 2000) (emphasis added).

"[P]hysical restraint with a gun is conduct distinct from either the actual discharge, 'otherwise use,' or brandishing, display or possession of a gun...." Id. at 526.  Importantly, "[t]hose acts alone do not automatically create a situation where physical restraint of an individual occurs.  Instead, something more must be done with the gun to physically restrain" an individual.  Id. at 526-27 (emphasis added).

In arguing that the physical restraint enhancement should not apply in this case, Miera contends that in the prior cases where this court has found the enhancement to apply based on physical restraint with a gun, the guns have always been pointed at particular individuals rather than "waved ... about the room generally."

It is true that in many cases where this court has found § 2B3.1(b)(4)(B) applicable, particular individuals have been targeted for restraint.[3] Nevertheless, this court has not held that when a firearm is involved such individual targeting is necessary to give rise to the enhancement. Instead, we have held that "something more must be done with the gun to physically restrain" an individual than merely displaying or brandishing the gun. Pearson, 211 F.3d at 526-27 (emphasis added).

In this case, three circumstances support the notion that Miera, through the actions of his accomplice, Timothy, did "something more" than merely brandish a firearm. First, it is undisputed that Timothy "point[ed] the gun around the room."

---

[3] See United States v. Xayaso, 45 Fed. App'x 843, 846 (10th Cir. 2002) (unpublished) (assailant "pointed his pistol at a teller attempting to activate an alarm and ordered him to stand"); United States v. Davis, 29 Fed. App'x 535, 536 (10th Cir. 2002) (unpublished) ("defendants shouted obscenities and death threats while swinging their rifles, and both pointed their weapons at the faces of the employees and customers"); United States v. Khleang, 3 Fed. App'x 672, 675 (10th Cir. 2001) (unpublished) ("[t]he bank employee was not only restrained by the pointing of the gun at her, albeit brief in duration, but she was restrained further by the other robber's immediate physical proximity to her"); United States v. Villanueva, No. 99-1399, 2000 WL 1682988, at *2 (10th Cir. Nov. 9, 2000) (unpublished) ("when [defendant] took additional action with the gun, by using it to force bank employees to lie on the floor and demanding they stay down, he went beyond the act of merely brandishing his gun in commission of the robbery, to the act of restraining bank employees with the gun"); Pearson, 211 F.3d at 527 (defendant held gun "on two bank employees to keep them from moving while his accomplice took a third employee to the bank vault"); United States v. Rucker, 178 F.3d 1369, 1373 (10th Cir. 1999) (defendant pointed gun at victims); United States v. Sours, No. 98-5072, 1999 WL 241839, at *3 (10th Cir. Apr. 23, 1999) (unpublished) (defendant pointed BB gun at victims and ordered them to the lie on the floor); Fisher, 132 F.3d at 1330 ("coconspirator deliberately kept the security guard at bay by pointing a gun directly at his head while two others looted the teller counter").

Even if it is assumed that Timothy did so aimlessly and somehow avoided targeting any particular individual with the firearm, such conduct would, in all likelihood, have had the effect of physically restraining everyone in his presence.[4]

Second, when Miera and Timothy entered the bank, they commanded that the bank's occupants "don't move." Thereafter, Timothy continued "telling ... people not to move in a loud, strong voice." When this conduct is coupled with Timothy's haphazard pointing of the gun, it is clear that Timothy did "something more" than merely brandish a gun and that a reasonable person would have felt physically restrained under such circumstances. After all, by demanding in a "loud, strong voice" that the bank's occupants "don't move," Timothy specifically sought to hinder the occupants' movement.

Third, Timothy did all of this while standing in front of the bank's door. By doing so he in all likelihood blocked the bank's customer exit, and thereby kept the bank's occupants from even considering an escape. "*Keeping someone from doing something* is inherent within the concept of restraint...." Fisher, 132 F.3d at 1329-30.

These circumstances, of course, may be readily contrasted with the mere brandishing of a gun. For instance, imagine a scenario where Miera had simply

---

[4] Based on such conduct, one could infer that at various times the gun was pointed at specific individuals who would thereby have felt particularly physically restrained. Indeed, according to Miera's PSR, Timothy "suggested that he may have pointed his pistol at two individuals and told people to keep their hands in view."

walked up to the teller's station with a gun visible in his waistband and demanded money. This conduct may not have involved "something more" and thereby presumably would not have given rise to the § 2B3.1(b)(4)(B) enhancement. What we have here, however, is far afield of such conduct. In this case, a firearm was pointed about the bank, presumably taking in all those present within its ambit; individuals were commanded not to move; and the bank's customer exit was effectively blocked. There is no doubt that such conduct involved "something more" and thereby appropriately resulted in a physical restraint enhancement.[5]

### III. CONCLUSION

For the foregoing reasons, Miera's sentence is AFFIRMED.

---

[5] Miera incidently contends that the district court misapprehended the contours of the § 2B3.1(b)(4)(B) enhancement when it may have suggested that if only tellers were restrained, the enhancement might not apply. However, the district court was merely observing that here the restraint was more pervasive than the typical bank robbery because customers were implicated in addition to tellers. We see nothing in this comment that would support Miera's claim that his accomplice did not physically restrain people during the course of the bank robbery.